E-FILED
Monday, 20 October, 2014  01:47:59 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **LINDA MINER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 13-CV-2035** |
| | ) | |
| **PETERSEN HEALTH CARE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER

This case is before the court for ruling on the Motion for Summary Judgment (#19) filed by Defendant Petersen Health Care, Inc.  This court has carefully reviewed the arguments of the parties and the documents filed by the parties.  Following this careful and thorough review, Defendant's Motion for Summary Judgment (#19) is GRANTED.

### FACTS[1]

In September 2010, Plaintiff, Linda Miner, was hired by Defendant as Director of Nursing for the Bement Health Care Center.  Although Plaintiff's scheduled hours were from 8:00 a.m. to 4:00 p.m., she understood that she was to be available at all times, "24/7," due to the nature of her position.  As Director of Nursing, Plaintiff's job responsibilities required her to manage and lead the nursing department of the Bement Health Care Center.  It is undisputed that this meant demonstrating professionalism

---

[1]  The facts are taken from Defendant's statement of Undisputed Material Facts, Plaintiff's statement of Additional Facts and the documents submitted by the parties, including the transcript of Plaintiff's deposition.  This court has only included facts which are material to the issues raised and are adequately supported by evidence in the record.

while working with all departments and staff, leading by example, at times working as

a staff nurse to assist the department and meet the needs of residents, following up on

memo requests on a timely basis, reporting serious resident issues, and working very

closely with the Administrator to provide a "united front" to staff.  Plaintiff had many

other responsibilities, including observing medication passes and treatments, staffing,

budgetary issues, and preparing the Nursing Department for surveys.

When Plaintiff began her employment, she was provided a copy of Defendant's

Employee Handbook and a copy of the Progressive Discipline Policy.  The Employee

Handbook contained Defendant's Family and Medical Leave Act (FMLA) policy.  The

policy listed the reasons that would allow an employee to take leave under the FMLA.

One of the reasons was "because of your own serious health condition which renders

you unable to perform the functions of your position."  The policy also stated:

> Notice of Leave.  If your need for family/medical leave is
>
> foreseeable, you must give the company at least 30 days prior
>
> written notice.  If this is not possible, you must at least give notice as
>
> soon as practicable (within 1 to 2 business days of learning of your
>
> need for leave).  Failure to provide such notice may be grounds for
>
> delay of the leave.  Where the need for leave is not foreseeable, you
>
> are expected to notify the company within 1 to 2 business days of
>
> learning of your need for leave, except in extraordinary
>
> circumstances.  The Company has Request for Family/ Medical

Leave forms available from the administrator.  You should use these

forms when requesting leave.

The policy also stated that, if an employee was requesting leave because of a serious

health condition, the employee and the relevant health care provider must supply

appropriate medical certification.  The policy stated that Medical Certification Forms

were available from the administrator.

When Plaintiff was hired, Adam Pullen was the Administrator of the Bement

Health Care Center and was Plaintiff's immediate supervisor.  Jill West was her

regional supervisor.  On April 19, 2011, Plaintiff received a document captioned "Job in

Jeopardy" from Pullen.[2]  The document stated, "This is to inform you that your conduct

has placed your job in jeopardy.  This notice shall serve as a reasonable opportunity to

keep your job."  The basis for the "Job in Jeopardy" warning was Plaintiff's failure to

report the alleged physical abuse of a resident.  This was considered a "Major Offense"

under the Progressive Discipline Policy.  Plaintiff was suspended without pay for three

days and informed that another failure to report such an incident would result in

termination.

On July 12, 2011, Plaintiff received a document entitled "Supervisor Report of

Counsel" signed by Pullen.  This document stated that Plaintiff was not meeting the

---

[2] Plaintiff has argued that incidents which occurred prior to the initiation of the "Action Plan" are irrelevant, because they were not the stated reason for her termination.  Plaintiff has cited no authority for this argument.  This court concludes that an employee's employment history is obviously relevant in a case challenging the employee's termination.

standards of the position and indicated that consequences could include "[f]urther

progression in the disciplinary process."  The document further stated that "[a]s

Director of Nursing [it] is imperative that you lead and follow up on your staff to make

sure that the standards of care expected by Petersen Health Care and at Bement Health

Care Center are being met."  During the summer of 2011, April Utley was transitioning

into the job of Administrator.  Utley also signed the "Supervisor Report of Counsel" in

the space for a witness signature.  Plaintiff understood that this document was a

disciplinary record that was being placed in her file.

Plaintiff received the document at a counseling session with Pullen and Utley.

Before their conversation had concluded, Plaintiff "sort of passed out."  Pullen and

Utley called for paramedics, but Plaintiff refused care.

During the summer of 2011, Plaintiff applied for employment at three different

health care facilities.

In September 2011, Utley replaced Pullen as Administrator and became

Plaintiff's immediate supervisor.  On October 31, 2011, Utley issued an "Action Plan" to

Plaintiff, which identified a number of deficiencies in Plaintiff's performance of the

general requirements for the Director of Nursing as well as the requirements in the

Director of Nursing job description.  The Action Plan listed several job responsibilities

that were in need of immediate improvement, including the need to: improve

communication with staff; at times work as a staff nurse to meet resident needs; follow

up on any and all memo requests on a timely basis; manage the nursing budgetary issues; provide education to staff regarding surveys; and control the level of anxiety in stressful situations.

On the same day, Utley met with Plaintiff concerning the Action Plan and discussed the plan's purpose, which was to establish a series of regular evaluations of Plaintiff's job performance based on the items identified in the written plan. The Action Plan stated that it would last 90 days. During the first four weeks, Plaintiff and Utley were to meet on a weekly basis every Friday, followed by meetings to be held every other Friday for the remainder of the 90 days. Utley testified that the purpose of the Action Plan was for Plaintiff to keep her job and improve. However, the Action Plan stated that failure to perform the Action Plan would result in termination.

During the subsequent meetings between Utley and Plaintiff pursuant to the Action Plan, Utley would specify before each meeting certain items derived from the written Action Plan which Plaintiff was to bring to the meeting for Utley's review. During the course of these meetings, Utley informed Plaintiff that it was Utley's impression that Plaintiff was not accepting opportunities to assist directly with the residents. Utley also felt that Plaintiff was not communicating well with the staff. On November 10, 2011, Utley received a resignation notice from another employee. The notice stated that the employee was resigning because of Plaintiff.

Utley prepared "Weekly Notes" which contemporaneously summarized each of Utley's Action Plan meetings with Plaintiff between November 13, 2011, and November 26, 2011.  These notes recorded Utley's perspective on Plaintiff's continued job performance issues, including: (1) "[c]ontinued to find ways of getting out of work on the floor;" (2) "[w]ay [too] many overtime hours for nursing;" (3) "[n]o one observed" for medication passes and treatment; (4) "[c]alls April for every staffing issue, tells staff that I say one thing when in fact I didn't.  Will tell staff they have to call me and then tell me she never said that;" (5) "[s]everal cna complaints: Wouldn't help on floor when short or when asked by cnas.  Staff say yelling at them when relaying information, staff feel talked down to and disrespected.  Expects them to do everything but will do nothing herself;" (6) "CNA book [was] not up to date, had several holes when I reviewed;" (7) "[o]vertime still a problem;" (8) "[h]ours worked/time care reports not getting back to me, several missed punches;" (9) "[d]uring mock survey, it was found[] that the survey book was not accurate and did not meet requirements;" (11) "[h]ad very negative attitude during mock survey."  In addition, Utley had been informed that Plaintiff had "told several staff she was getting fired" during the week of November 20, 2011.

On November 30, 2011, 30 days after the Action Plan began, Plaintiff faxed a "Health Status Form" to the Bement Health Care Center.  The form came from Plaintiff's health care provider, Springfield Clinic.  The form stated that Plaintiff would be unable to work from November 30, 2011 through December 5, 2011.  The form also

stated that Plaintiff would be available to return to work on December 6, 2011, without

restrictions.  Plaintiff testified that she sought treatment at the Springfield Clinic

because she was experiencing some chest pains, epigastric pain, and abdominal pain.

Plaintiff was seen by Linda Klemm, a nurse practitioner.  On the fax cover sheet

addressed to Utley at the Bement Health Care Center, Plaintiff wrote "Medical exam

has determined a number of Intense Diagnostic tests are indicated including full heart

work-up that starts today.  Will keep you updated.  Please use PTO for these days."

The abbreviation "PTO" stands for "Paid Time Off."  Plaintiff telephoned Utley and

told her that she was having chest pains and a Cardiolite test had to be done by

Cardiology.  Plaintiff's medical records, which she attached to her Response to the

Motion for Summary Judgment, stated that Plaintiff was diagnosed on November 30,

2011, with epigastric pain, chest pain, and anxiety disorder.

On December 2, 2011, Plaintiff faxed another Health Status Form to the Bement

Health Care Center.  This form was signed by nurse practitioner Klemm and stated that

Plaintiff was unable to work from December 2, 2011 through December 7, 2011.  The

form stated that Plaintiff would be able to return to work on December 8, 2011, without

restrictions.  Plaintiff also called and told a member of the administration that she

would be absent.  On December 7, 2011, Plaintiff faxed another Health Status Report to

the Bement Health Care Center.  This form stated that Plaintiff was unable to work from

December 7, 2011 through December 11, 2011.  The form, again signed by Klemm,

stated that Plaintiff would be able to return to work on December 12, 2011, without

restrictions.  Plaintiff again called and talked to either Utley or Jackie Kuntz about the form.  During the period from November 30, 3011, to December 11, 2011, Plaintiff was considered to be on sick leave by Petersen Health Care.  On December 8, 2011, Utley asked Plaintiff to be on call and Plaintiff refused because she was on medication.  Utley considered this an act of insubordination.

On December 12, 2011, Plaintiff reported for work and worked each day during the week of December 12, 2011 through December 16, 2011.  During this week, it was Utley's perception that Plaintiff's performance had not improved and that her attitude remained consistently negative.  Utley documented her dissatisfaction with Plaintiff's performance.  In particular, Utley noted that Plaintiff was very short with her staff when they asked her a question, posted notes for her staff rather than talking to them, called Utley about staffing problems rather than handling them herself, did not come in at 6:00 a.m. as Utley asked her to do to help out with a short staff situation, and did not work on the floor when she did arrive at 7:30 a.m.   Utley was working on the floor and, when she told Plaintiff she had to get off the floor to get her work done, Plaintiff went back to her office.

On December 17, 2011, Plaintiff woke up with a rash all over her face.  She tried over the counter medications but the rash got worse and worse.  On December 19, 2011, Plaintiff sought medical treatment.  When Plaintiff saw Klemm at the Springfield Clinic that day, Plaintiff told Klemm that she was still very anxious about her job situation and wanted to be able to quit her job.  Klemm noted that Plaintiff did not want to return to

8

work until Friday when she could go in and resign and get her paycheck.  After this visit, Plaintiff faxed another Health Status Form to the Bement Health Care Center.  The form, signed by Klemm, stated that Plaintiff would return to work on December 22, 2011, (a Thursday) without restrictions.  Plaintiff called Utley on December 19, 2011, and said she had a rash and believed she had shingles in her eye.  Plaintiff's medical records show that she was diagnosed with dermatitis, anxiety disorder, and possible shingles.

Plaintiff's medical records show that, on December 21, 2011, Plaintiff saw a GI doctor who diagnosed her with nausea, epigastric pain, change in stool, and bloating. On December 22, 2011, Plaintiff returned to the Springfield Clinic because her rash was worse.  Plaintiff's medical provider discontinued one medication and told Plaintiff to call back the following Tuesday.

On December 23, 2011, Plaintiff submitted another Health Status Form.  This form was dated December 22, 2011, and stated that Plaintiff would be unable to work from December 22, 2011 through December 27, 2011, and that she would return to work without restrictions on December 28, 2011.  Plaintiff brought this form to the Bement Health Care Center and gave it to Utley.  Plaintiff testified that she told Utley she had a rash and said, "I cannot come back until the 28th."[3]  Plaintiff testified that Utley said,

---

[3]  Utley testified that Plaintiff did not have a visible rash when she saw Plaintiff on December 23, 2011. Plaintiff has submitted pictures taken that day which show that she did have a rash.  This court will accept that Plaintiff had a rash on December 23, 2011.

9

"That really sucks.  I need somebody around here that can take up the slack, because I'm tired of doing it all.  I really think you need to think about putting in a resignation."  Plaintiff testified that she responded that she would be back on the 28th.  Utley testified that she told Plaintiff that she was physically and emotionally tired from working 60 hours a week and needed someone's help.  Utley testified that she told Plaintiff she could not continue to "pull all the slack myself."  Utley also testified that she asked Plaintiff if she would be returning to work and Plaintiff said she would.  Utley told Plaintiff that if she would not return to work, she needed to let Utley know if she "would request FMLA leave at that time."  Utley testified that Plaintiff did not say anything and left her office.  It is undisputed that Plaintiff was considered to be on sick leave from December 19, 2011, through December 27, 2011.

Utley was told that Plaintiff had driven herself to the facility on December 23, 2011.[4]  On December 24, 2011, Plaintiff went to Walmart to have a prescription filled.  While she was there, she also got some groceries.  Staff members of Bement Health Care Center reported to Utley that they had seen Plaintiff shopping.

None of the Health Status Forms submitted by Plaintiff included any kind of a diagnosis or any reason why Plaintiff had to be off work.  Also, it is undisputed that Plaintiff did not say anything about the FMLA in her phone calls to the Bement Health Care Center or when she brought the last form in to Utley.  Plaintiff's medical records

---

[4] Plaintiff testified at her deposition that her husband drove her but, because he was not supposed to be on the premises, he hid in the back seat and she got into the driver's seat to make it look like she was driving.

10

included notations that Plaintiff was under a tremendous amount of stress at work.
Plaintiff testified that she was prescribed medications to deal with her anxiety disorder
and other conditions and with her rash. She stated that two of the medications were
sedatives. Plaintiff testified that she told Utley that she was taking sedative-type
medications which are rather strong. Plaintiff testified that she let Utley know that the
medications would impact her judgment and made her very drowsy.

On December 27, 2011, Utley received a telephone call from a nursing home in
Decatur, Illinois. The caller was seeking verification of Plaintiff's employment and said
that Plaintiff had recently been at the nursing home and submitted an application for
employment as a floor nurse.

Utley testified that she tried to call Plaintiff between December 23 and 27, 2011,
to find out if Plaintiff had completed the staff schedule before December 16, 2011
(during the week she worked) and to discuss other work-related issues, but Plaintiff did
not return her calls. Plaintiff testified that staff members called her while she was on
leave regarding problems and that Utley told them to call her. Utley testified that staff
members called Plaintiff but Plaintiff did not return their calls. Utley also testified that,
when Plaintiff first submitted a leave request, Utley posted a note telling staff to contact
her rather than Plaintiff. Plaintiff testified that she did not return calls because she was
told by her medical provider not to work.

On December 28, 2011, Plaintiff reported for work.  Utley and the regional supervisor, Jill West, met with Plaintiff to inform her that her employment was terminated.  Plaintiff was provided with a written Notice of Termination.  In its "Description of Occurrence" section, the Notice of Termination listed "insubordinate acts, failure to carry out orders.  Work performance not up to established standards."  In addition, the Notice of Termination indicated that immediate discharge was warranted based on "Refusal to answer phone, return calls or messages from administrator, facility, and staff.  12/23-12/27/11."  The Notice of Termination was signed by Utley. During the termination meeting, Plaintiff made no reference to the FMLA.  At no time during her employment with Defendant did Plaintiff submit an FMLA leave request.

Plaintiff testified that West had previously told Plaintiff that she should never ask for FMLA leave and that an employee who had asked for it should be fired.  West stated in her affidavit that she never made these statements to Plaintiff.

PROCEDURAL HISTORY

On January 30, 2012, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).  Plaintiff alleged that Defendant discriminated against her on the basis of disability and age, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*

On February 7, 2013, Plaintiff filed her Complaint (#1) in this court. Plaintiff alleged that Defendant violated the FMLA by interfering with her FMLA rights by requiring her to work while she was on medical leave and by punishing her for not working while on medical leave. Plaintiff also alleged that Defendant retaliated against Plaintiff for exercising her FMLA rights when it terminated her employment.

On April 4, 2013, Defendant filed its Answer and Affirmative Defenses (#4). Defendant asserted that Plaintiff did not meet the necessary elements of an FMLA claim. Defendant stated that Plaintiff did not provide any evidence of eligibility for FMLA leave by demonstrating that she had a serious health condition leaving her unable to perform an essential function of her job. Defendant also stated that Plaintiff did not ever provide notice that she intended to take FMLA leave. Defendant stated that it could not deny an FMLA request that was never made. Defendant further stated that it did not have discriminatory or retaliatory intent in terminating Plaintiff's employment as there were considerable, documented independent grounds directly related to Plaintiff's job performance justifying her termination.

On April 30, 2014, Defendant filed a Motion for Summary Judgment (#19) with attached exhibits. On May 19, 2014, Plaintiff filed her Response to Defendant's Motion for Summary Judgment (#20), with attached exhibits. Defendant filed its Reply (#21) on June 2, 2014.

ANALYSIS

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  At the summary judgment stage, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Tolan v. Cotton*, ___ U.S ___, 134 S. Ct. 1861, 1866 (2014), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Tolan*, 134 S. Ct. at 1866, *citing Anderson*, 477 U.S. at 255; *see also Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture."  *Singer*, 593 F.3d at 533, *quoting Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).  "To survive summary judgment, the nonmoving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial."  *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), *citing Celotex Corp.*, 477 U.S. at 322-23.  If it is clear that the nonmovant will be

14

unable to establish an essential element of the claim, summary judgment is not only appropriate, but mandated.  *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006); *Martinez v. Harley-Davidson, Inc.*, 2012 WL 3881615, at *1 (E.D. Wis. 2012).

PLAINTIFF'S FMLA CLAIMS

The FMLA provides that an eligible employee may take up to twelve weeks of leave during any twelve-month period if she is unable to perform the functions of her position because of a serious health condition.  29 U.S.C. § 2612(a)(1)(D); *Hansen v. Fincantieri Marine Group, LLC*, 763 F.3d 832, 836 (7th Cir. 2014).  An employer is prohibited from interfering with the exercise of or the attempt to exercise rights under the FMLA.  *James v. Hyatt Regency Chicago*, 707 F.3d 775, 780 (7th Cir. 2013), *citing* 29 U.S.C. § 2615(a)(1).  And it is unlawful for an employer to retaliate against an employee who exercises or attempts to exercise FMLA rights.  *James,* 707 F.3d at 781, *citing* 29 U.S.C. § 2615(a)(2).  A central purpose of the FMLA is to guarantee medically necessary leave to employees in a manner that accommodates the legitimate interests of employers.  29 U.S.C. § 2601; *Martinez*, 2012 WL 3881615, at *15; *see also Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 951-52 (7th Cir. 2004).  Accordingly, the goal of the FMLA is "not to supplant employer-established sick leave and personal leave policies, but to provide leave for more uncommon and, presumably, time consuming events such as having or adopting a child or suffering from what is termed a 'serious health condition.'"  *Price v. City of Fort Wayne*, 117 F.3d 1022, 1023 (7th Cir. 1997).

INTERFERENCE

In order to succeed in an FMLA interference claim, a plaintiff must show that (1) she was eligible for the FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled.  *James*, 707 F.3d at 780; *see also Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014).  An employee is entitled to leave under the FMLA if (1) she is afflicted with a "serious health condition," and (2) that condition renders her unable to perform the functions of her job.  *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 669 (7th Cir. 2011).  In this case, there is no dispute that Plaintiff had worked enough hours to be eligible for FMLA benefits and that Defendant was an employer covered by the FMLA. While this court concludes that there is little evidence to show that Plaintiff suffered from a serious health condition and was entitled to take leave under the FMLA, *see Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 591 (7th Cir. 2008) (finding that the plaintiff's various afflictions did not amount to a serious health condition), the parties have focused their arguments on the fourth element of her interference claim, whether she provided sufficient notice of her intent to take leave.

The FMLA "requires notice to the employer of the need for leave."  *Gienapp v. Harbor Crest*, 756 F.3d 527, 529 (7th Cir. 2014); *see also Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 767 (7th Cir. 2008) ("[a]n employer is entitled to notice that an employee will need FMLA leave").  "The FMLA's notice burden is not onerous but neither is it

16

illusory." *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008).  Judge

Posner explained in *Aubuchon* that "[c]onditioning the right to take FMLA leave on the

employee's giving the required notice to his employer is the quid quo pro for the

employer's partial surrender of control over his work force" and that the "requirement

of notice reduces the burden on the employer."  *Aubuchon*, 3539 F.3d at 951-52.

Plaintiff has pointed out that the Seventh Circuit has stated:

> [W]e emphasize that the employee's duty is merely to place the
>
> employer on notice of a probable basis for FMLA leave.  He doesn't
>
> have to write a brief demonstrating a legal entitlement.  He just has
>
> to give the employer enough information to establish probable
>
> cause, as it were, to believe that he is entitled to FMLA leave.  That is
>
> enough to trigger the employer's duty to request such additional
>
> information from the employee's doctor or some other reputable
>
> source as may be necessary to confirm the employee's entitlement.

*Aubuchon*, 359 F.3d at 953.  An employee's primary duty in notifying her employer is to

provide enough information to the employer to show that she "*likely* has an FMLA-

qualifying condition."  *Burnett v. LFW Inc.*, 472 F.3d 471, 479 (7th Cir. 2006) (emphasis in

original).

Although an employee is not required to refer specifically to the FMLA in order

to give such notice, the notice "must succeed in alerting the employer to the seriousness

of the health condition."  *de la Rama*, 541 F.3d at 687, *citing Stevenson v. Hyre Elec. Co.*, 505

F.3d 720, 725 (7th Cir. 2007).  Providing the employer with a doctor's note does not constitute sufficient notice "if the note does not convey the seriousness of her medical condition." *de la Rama*, 541 F.3d at 687.

The Seventh Circuit recently reiterated that "[a]n employee must provide her employer with sufficient information to notify them that she has a serious health condition that requires FMLA protection." *Spurling*, 739 F.3d at 1063.  The court then stated:

> We cannot hold that the employer must divine or investigate whether an employee has a condition covered under the FMLA at any minor request for leave.  We have explicitly rejected that position, as the majority of leaves requested by employees do not rise to FMLA protections. *Aubuchon*, 359 F.3d [at 953].  To hold otherwise would "place a substantial and largely wasted investigative burden on employers." *Id.*  Therefore, "unless the employer already knows that the employee has an FMLA-authorized ground for leave, . . . the employee must communicate the ground to him; he cannot just demand leave." *Id.*

*Spurling*, 739 F.3d at 1063.  The Seventh Circuit then determined that the plaintiff's "vague assertion that she needed time off to determine why she was falling asleep was not sufficient to put [the employer] on notice that she had a serious medical condition that required FMLA leave." *Spurling*, 739 F.3d at 1063.  Similarly, in *Aubuchon*, the case

18

relied upon by Plaintiff, the Seventh Circuit concluded that the notice provided by the employee was insufficient. *Aubuchon*, 359 F.3d at 952-53. The court specifically stated that the "requirement of notice is not satisfied by the employee's merely demanding leave" because the employee "must give the employer a reason to believe that [s]he's entitled to it." *Aubuchon*, 359 F.3d at 952; *see also Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008-09 (7th Cir. 2001) (notice not sufficient because the employee did not suggest to the employer that her medical condition might be serious or that FMLA leave could be applicable); *cf. Pagel v. TIN Inc.*, 695 F.3d 622, 628 (7th Cir. 2012) (question of fact regarding whether notice was sufficient where the employer was aware of the employee's chest pain and was told the employee was going to be in the hospital); *Burnett*, 472 F.3d at 480-81 (the employee's communications regarding his health problems over a period of four months, including the fact that he had a biopsy to test for cancer, meant that his proclamation of illness was supported by details suggesting a serious health condition); *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) (finding that employee's significant change in behavior may have been enough to notify a reasonable employer that the employee suffered from a serious health condition).

Defendant argues that, in serially submitting bare-bones Health Status Forms, each of which stated that Plaintiff would soon return to work without restrictions, Plaintiff did not provide sufficient notice of her intent to take leave under the FMLA. This court agrees. Plaintiff initially requested leave on November 30, 2011, stating that she was having chest pain and was scheduled for diagnostic tests. Plaintiff did not

19

provide Defendant with any information regarding the results of the diagnostic tests or any medical condition or diagnosis.  Instead, she returned to work on December 12, 2011, and worked for one week.  Plaintiff then requested leave on December 19, 2011, telling Utley that she had a rash and believed she had shingles in her eye.  A few days later, on December 23, 2011, she submitted another Health Status Form, indicating that she would be absent until December 28, 2011, at which time she could return without restrictions.  There was no reason for Utley to believe Plaintiff was suffering from a heart condition or any other serious medical condition that would require Plaintiff to request FMLA leave.  In addition, Utley was informed that Plaintiff had driven herself to the Bement Health Care Center on December 23, 2011, and that Plaintiff was seen shopping at Wal-mart on December 24, 2011.

This court agrees with Defendant that Utley reasonably believed that Plaintiff was out for a short period of paid sick leave.  This court further agrees with Defendant that the Health Status Forms submitted by Plaintiff, which included no diagnosis and indicated an imminent return to work with no restrictions, were not sufficient to trigger a duty on the part of Defendant to request additional information regarding whether Plaintiff was entitled to FMLA leave.  *See de la Rama*, 541 F.3d at 687.  Based upon the information provided by Plaintiff, there was no reason for Utley to suspect a serious health condition and initiate her own investigation into the appropriateness of FMLA

leave, in place of the regular paid time off that Plaintiff was actually requesting.
Plaintiff did not inform Utley that she had a "serious health condition."  *See Spurling*,
739 F.3d at 1063.

In addition, the Department of Labor has issued detailed regulations governing
the notice requirement.  *See* 29 C.F.R. §§ 825.300 *et seq.*    The regulations were amended
in 2009 and 2013, so the 2009 version applies to Plaintiff's claim.  *See Gienapp*, 756 F.3d at
529.  The regulations permit an employer to enforce notice and other procedural
requirements for invoking FMLA leave.  *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819,
825 (7th Cir. 2012).  Section 825.303, which applies to situations where the need for leave
is not foreseeable in advance, provides that the "employee must comply with the
employer's usual and customary notice and procedural requirements for requesting
leave, absent unusual circumstances."  29 C.F.R. § 825.303(c); s*ee also Gienapp*, 756 F.3d at
529.  An employee's failure to comply with the notice requirements of the FMLA and its
regulations "forecloses . . . an FMLA interference claim because [the employee] did not
fulfill her obligations in order to be protected."  *Ridings*, 537 F.3d at 771; *see also*
*Nicholson*, 690 F.3d at 825-26.

As cited above, Defendant's policy states that an employee should use
Defendant's Request for Family/Medical Leave form when requesting FMLA leave.
Plaintiff obviously did not do this.  Plaintiff has argued that Defendant's policies are
confusing.  Plaintiff contends that Defendant's policies could be read to require an
employee to take paid leave until it is depleted before requesting FMLA leave.

Defendant has argued that Plaintiff's argument is remarkable, considering that Plaintiff was a supervisor for Defendant and was responsible for educating her subordinates about Defendant's policies and advising the Administrator of her thoughts regarding necessary changes to such policies and procedures.  Defendant also argued that, instead of being confusing, its leave policy was designed to help employees by allowing them, in the event of a serious medical condition, to use paid time off first and thereby maximize the length of their subsequent FMLA leave.   In any case, this court concludes that Defendant's policy clearly provides that an employee should use Defendant's Request for Family/Medical Leave form when requesting FMLA leave.[5]  Plaintiff failed to do so and, for this reason as well, Plaintiff failed to give sufficient notice of her intent to take FMLA leave.

Plaintiff insists that the question of whether she provided sufficient notice is a question of fact for the jury.  It is true that the notice inquiry is a "fact-rich question" which is best resolved by the trier of fact where "the employer and employee dispute the quantity and nature of communications regarding the employee's illness."  *Pagel*, 695 F.3d at 628, *quoting Burnett*, 472 F.3d at 479 n.4.  However, this court concludes that, in this case, the material facts are essentially undisputed.

---

[5] This court agrees with the district court in *Levine v. Children's Museum of Indianapolis, Inc.*, 2002 WL 1800254, at *9 (S.D. Ind. 2002), *aff'd* 61 Fed. Appx. 298 (7th Cir. 2003), that the fact that an employer has a flexible leave policy does not mean that the employer has subjected itself to a lower threshold for imputing FMLA notice.  The critical issue remains whether the plaintiff put the employer on notice of an absence that triggered the employer's duties under the FMLA.  *Levine*, 2002 WL 1800254, at *9.

The content of the documentation Plaintiff provided to Defendant regarding her leave is not disputed and there is no material dispute regarding the information Plaintiff provided to Utley regarding her need for leave.  This court recognizes that there is a factual dispute regarding whether West had previously told Plaintiff that she should never ask for FMLA leave and that an employee who had requested FMLA leave should be fired.  Plaintiff testified regarding West's statements to her and West denies making these statements.  This court concludes, however, that this dispute is not material to the issue of notice because Plaintiff did not testify, and has not argued, that she did not request FMLA leave because of West's statement.

This court notes that, in fact, Plaintiff has presented no evidence that she intended to take FMLA leave.  Instead, she reported for work on December 28, 2011, apparently fully recovered from her rash.  Her employment was then terminated for poor performance, which was well documented before her short periods of paid sick leave.  "[E]mployers may fire employees for poor performance if they would have fired them for their performance regardless of their having taken leave."  *Pagel*, 695 F.3d at 629.  This court concludes that Plaintiff has not shown that there is a genuine issue of material fact regarding an essential element of her claim, that she provided sufficient notice of her intent to take FMLA leave.  The fact that Plaintiff took some short-term periods of paid sick leave does not make her termination a violation of the FMLA when she did not request FMLA leave.

## RETALIATION

Employers are prohibited from retaliating against an employee who exercises or attempts to exercise FMLA rights.  29 U.S.C. § 2615(a)(2).  In order to prove retaliation under the direct method, Plaintiff "must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two."[6]  *Caskey*, 535 F.3d at 593.  This court concludes that Plaintiff's retaliation claim is a non-starter.  Because she did not provide sufficient notice of the need for FMLA-qualifying leave, she never engaged in any activity protected by the FMLA.  *See Nicholson*, 690 F.3d at 828; s*ee also Gorski v. Med. Protective Co.*, 2010 WL 4684023, at *13 (N.D. Ind. 2010).

 IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion for Summary Judgment (#19) is GRANTED.  Judgment is entered in favor of Defendant and against Plaintiff.

(2) This case is terminated.

ENTERED this _____20th_____ day of _____October_____, 2014.

s/Colin S. Bruce
___                              ____
COLIN S. BRUCE
U.S. DISTRICT JUDGE

---

[6]  Plaintiff has not contested Defendant's argument that she is proceeding under the direct method of proof.

24